**COMMODITY FUTURES TRADING COMMISSION, State of New Jersey, and State of Florida, Plaintiffs,**

v.

**AMERICAN METAL EXCHANGE CORP., Anglo Swiss Metals, Ltd., F.C. & M. Investment Corp., Trans World Metals Corporation, Amalgamated Redemption Centers, Inc., Robert Maxwell a/k/a Robert Lebovitch, Bill Frank, and Michael Jebrock, Defendants.**

Civ. No. 87–2591.

United States District Court,
D. New Jersey.

July 18, 1988.

---

Melvin Schwartz, Lawrence Duffy, Baskin, Flaherty, Elliott, Manning & Schwartz, Boca Raton, Fla., and John T. Kelley, Baskin, Flaherty, Elliott, Manning & Gorman, Marlton, N.J., for Transword Metals Corp. and Michael Jebrock.

Agnes I. Rymer, Clapp & Eisenberg, Newark, N.J., and Charles J. Hecht, New York City, for defendant Robert Maxwell.

Dennis M. O'Keefe, Stephen Hall and Christina Franz, Div. of Enforcement, Commodity Future Trading Com'n, Washington, D.C., and Samuel A. Alito, Jr., U.S. Atty., Newark, N.J., for Commodity Future Trading Com'n.

Rodney C. Wade, Asst. Gen. Counsel, Office of the Comptroller, Tallahassee, Fla., for the State of Fla.

Claude E. Salomon, Deputy Atty. Gen., Div. of Law, Newark, N.J., for the State of N.J.

Thomas Greelish, LeBoeuf, Lamb, Leiby & MacRae, Newark, N.J., Temporary Equity Receiver of Anglo Swiss Metal Corp., American Metals Exchange Corp., FC & M Inv. Corp.

Robert Eisenberg, Jersey City, N.J., and Stanley Meyer, DePetris & Meyer, New York City, for Bill Frank, American Metals Exchange, AC & M Inv. Corp., and Anglo Swiss Metals.

## OPINION

HAROLD A. ACKERMAN, District Judge.

### I. INTRODUCTION

In this action, the Commodity Futures Trading Commission ("CFTC") and the States of Florida and New Jersey seek the issuance of injunctive and ancillary equitable relief against various persons and corporations allegedly engaged in conduct which violates the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.*, N.J.S.A. 49:3–60, *et seq.*, and Fla.Stat.Ann. § 517.101 *et seq.*

In July of 1987, the court granted such relief as against defendants American Metals Exchange ("AME"), Anglo Swiss Metals ("Anglo Swiss"), FC & M Investment Corp. ("FC & M") and Bill Frank. At that time, I also appointed Thomas Greelish, Esq. to serve as the temporary equity receiver for the corporate defendants.

Plaintiffs now seek to amend the complaint with new claims for violations of state and federal law and obtain similar equitable relief with respect to the newly named defendants Robert Maxwell a/k/a Robert Lebovich ("Maxwell"), Amalgamated Redemption Centers, Inc. ("ARC"), Michael Jebrock ("Jebrock") and Transworld Metals Corporation ("TWM"). Specifically, plaintiffs seek a court order which freezes defendants' assets, gives plaintiffs access to their books, enjoins defendants from offering, selling or accepting funds for the offer and sale of securities, appoints a receiver to marshall, account for and distribute assets for the benefit of the corporate investors, and requires the individual defendants to make an accounting of their assets. Defendants have vigorously opposed the issuance of such relief.

## II. STANDARD FOR STATUTORY INJUNCTIVE RELIEF

Pursuant to 7 U.S.C. § 13a–1, injunctive relief may issue upon a showing that the defendants "engaged in, [are] engaging in or [are] about to engage in any act or practice" which constitutes a violation of any provision of the CEA. Thus, in order to issue such relief, the court must consider past violations as well as whether or not there is a reasonable likelihood of continued and future violations. *CFTC v. Hunt,* 591 F.2d 1211, 1220 (7th Cir.), *cert. denied,* 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979), *CFTC v. Commodities Fluctuations Systems, Inc.,* 583 F.Supp. 1382 (S.D.N.Y.1984). Whether or not there is a reasonable likelihood of future violations depends upon a consideration of the totality of the circumstances and may be inferred, or even presumed, from past unlawful conduct, and the absence of proof to the contrary. *Hunt, supra; CFTC v. British American Commodity Options,* 560 F.2d 135, 142 (2d Cir.1977), *cert. denied,* 438 U.S. 905, 98 S.Ct. 3123, 57 L.Ed.2d 1147 (1978), *CFTC v. Heritage Capital Advisory Services, Ltd.,* [80–82 Transfer Binder] Fed.Comm.Fut.L.Rep. ¶ 26, 627 (N.D.Ill.

1982), *CFTC v. Morgan Harris & Scott, Ltd.,* 484 F.Supp. 669, 676–71 (S.D.N.Y. 1979). *See also SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 807 (2d Cir. 1975). Proof of irreparable harm is not required for the issuance of this statutorily provided injunctive relief. *See e.g., Morgan, Harris, supra* at 676 and cases cited therein.

Furthermore, under the CEA, the court may, in its sound discretion, appoint a receiver and order ancillary relief in the form of an accounting, disgorgement of profits, freezing of assets, and maintenance of the status quo based upon a consideration of violations of the CEA and the need to protect the public interest in preventing the diversion of corporate assets, detering future fraud, and impeding defendants from benefiting from their misconduct. *CFTC v. Co. Petro Marketing Corp.,* 680 F.2d 573, 582–83 (9th Cir.1982); *Morgan, Harris, supra; CFTC ex rel Kelley v. Skorupskas,* 605 F.Supp. 923 (E.D. Mich.1985).

As the defendants asserted that there are issues of fact in dispute, *see* Hearing Transcript, dated February 10, 1988, the court conducted a series of evidentiary hearings on March 28, 29, 30, 31 and April 4 and 5, 1988, during which time testimony was heard and evidence was received in support of and in opposition to plaintiffs' application. Additionally, the Court accepted, pursuant to the stipulation of the parties, *see e.g.* Hearing Transcript dated April 5, 1988 at 72, depositions and documentary evidence in lieu of live testimony. Thus, in addition to the briefs and exhibits submitted to the court prior to the hearing, the court has considered the depositions of Rene Champagne, Richard Cowen, Barry Gladden, Michael Jebrock, Carol Kahan, Robert Maxwell, John McNamara, Helen Reynolds, James Stephens, Martin Stein, Shirley Stier and Daniel Weiner.[1] I have also considered all exhibits which were included with these depositions, those

---

1. I have also reviewed the videotape depositions of Messrs Jebrock, McNamara, Cowen and Weiner as well as Ms. Stier. I note for the record that Mr. Jebrock waived his presence at certain depositions.

offered prior to and at the hearing,[2] as well as the "Report to Thomas W. Greelish, Esq., Temporary Equity Receiver for American Metals, *et al*" ("Accountants Report) and attachments thereto. I accepted all evidence mindful that hearsay materials and evidence other than live testimony are properly considered by the Court in preliminary injunction proceedings. *Asseo v. Pan American Grain Co.*, 805 F.2d 23, 26 (1st Cir.1986); *Wounded Knee Legal Defense/Offense Committee v. FBI*, 507 F.2d 1281, 1287 (8th Cir.1974); *National Organization for Reform Marijuana Laws v. Mullen*, 608 F.Supp. 945, 950 n. 5 (N.D.Ca. 1985); *Bracco v. Lackner*, 462 F.Supp. 436, 442 n. 3 (N.D.Ca.1978); *SEC v. Vesco*, 358 F.Supp. 1186, 1188 (S.D.N.Y.1973). Thus, I considered evidence which is not necessarily the sort which would be admissible in a final trial on the merits since in the context of a request for emergent relief, the rules of evidence are relaxed so as to provide swift relief, avoid lengthy proceedings and prevent irreparable harm. Fed.R.Civ.P. 65(a)(2), and advisory committee note; *Flynt Distributing Co. Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir.1984); *Wounded Knee, supra* at 1287 and cases from the Second, Fifth and Ninth Circuits cited therein; *SEC v. General Refractories Co.*, 400 F.Supp. 1248, 1255 (D.C.D.C.1975); *Vesco, supra.*

## III. FINDINGS OF FACT

Having reviewed the record in light of this request for interlocutery injunctive relief, I make the following findings of fact, as required under Fed.R.Civ.P. 52(a).

### A. *Key Players*

Before explaining the commodities program at issue, I shall first explain the corporations and individuals who established the challenged program.

#### i. Anglo Swiss

Defendant Anglo Swiss was incorporated in the Republic of Panama on June 9, 1986, "for the explicit purpose and ownership of all outstanding and issued shares of American Metals Exhchange."[3] *See* Shareholders Agreement at 3, submitted as Reynolds Ex. 2, Maxwell Ex. 27, MJ 80; MJ 82. Among shareholders of Anglo Swiss are Robert Maxwell, Bill Frank, Michael Wal-

---

**2.** The plaintiffs as well as defendant Jebrock challenge the admissibility of three redacted transcripts of tape recorded conversations among, *inter alia,* Jebrock, Maxwell and Frank which took place in Maxwell's New York offices on September 9, 1985, April 20, 1986, and April 30, 1986. In support of their admission, Mr. Maxwell's attorney, Charles Hecht, Esq., offered his own affidavit in support of the authenticity of the tapes. As I have already informed Mr. Hecht, Local Rule 27(A) of the General Rules of New Jersey, allows the court to disregard legal arguments contained in such affidavit. As his affidavit is in fact such a document, I will strike his affidavit as it violates Local Rule 27(A).

Furthermore, with respect to the admissibility of the transcripts of these conversation, I find that the proponent of this evidence has not established "clear and convincing evidence of authenticity and accuracy...." *United States v. Starks,* 515 F.2d 112, 121 (3d Cir.1975). Of particular importance in this regard is the position of Mr. Jebrock. He was present at these meetings but he states, through counsel that "based upon his recollection, Mr. Jebrock believes that portions of the conversations have in some manner been omitted or deleted from the tape recordings." *See* letter to the court from Lawrence Duffy, Esq. dated April 8, 1988. Relatedly, the proof reading remarks of the plain-

tiffs' reporter note a variety of gaps. Without ruling on whether these gaps establish the existence of tampering, I find the gaps along with Mr. Jebrock's representation to the court are sufficient to find that the evidence fails to meet the *Stark's* test.

In addition to the tapes, there was some discussion at the hearing regarding the admissibility of the exhibits marked Maxwell 29. On April 5, 1988, at 65–66, Mr. Hecht moved for its admission. The CFTC objected on the ground that it had no time to review the document since the document had not been produced prior to the hearing. The state of Florida objected on the basis of the manner it was produced. I instructed the parties to put their position regarding its admissibility in writing. The government's memorandum on this issue reveals, however, that they no longer object to its admissibility and thus, Maxwell 29 shall be admitted into evidence.

**3.** Anglo Swiss is also the parent of Lead Investment Company ("LIC"), which was sold to Anglo Swiss by Michael Wallach and Michael Jebrock in exchange for ten percent of the stock of Anglo Swiss. Deposition of Michael Jebrock at 83. Apparently Mr. Maxwell sought to control LIC so as to obtain the profits of sales of leads to agents of AME *id.* at 317.

lach, Michael Jebrock and Steven Kramer.[4] *See* Shareholders Agreement at 45, 46; Deposition of Michael Jebrock at 185, MJ 82; Accountants Report at 3; Deposition of Martin Stein at 40, 47. In addition, Messrs Frank, Maxwell and Jebrock are listed as directors of AME. Mr. Frank is also listed as its President and Mr. Jebrock as First Vice President.[5] Shareholders Agreement at 6; Accountants Report at 5, 35.

### ii. Role of Robert Maxwell

While not named as an officer, the evidence reflects a perception as well as the reality that Mr. Maxwell controlled Anglo Swiss. Deposition of Martin Stein at 88–87. Reynolds Ex. 2. For example, the testimony reveals that Maxwell instructed his law firm, Phillips, Nizer, Benjamin, Krim and Ballon to incorporate Anglo Swiss in Panama. Deposition of Martin Stein, Esq., formerly a partner with that firm, at 85–87; Deposition of Michael Jebrock dated April 6, 1988 at 42; Deposition of Rene Champagne at 20; Statement of Michael Wallach, dated October 23, 1987 at 9; Hearing Testimony of Steven Kramer, dated March 31, 1988 at 52. *See also* Statement of Michael Wallach, dated October 28, 1987, at 2 in which he stated Maxwell formed Anglo Swiss to hold the stock of AME, TC & M and LIC. Moreover, his company, Contract Furnishing and Systems, Ltd. was billed for the incorporation. *See* MS 120. Most importantly, Maxwell and his associates agreed to contribute $5 million to establish Anglo Swiss.[6] Specifically by letter from Ronald Luzim, Esq., to Michael Jebrock, dated June 19, 1986, Mr. Jebrock was informed that there

> ... exists a financial committment from Messers Maxwell, Gold and Edson of $4,800,000.00 for the above described corporation which is made up of a $50,-000.00 cash capitalization, $250,000.00 bank account located in the country of Panama, and a letter of credit issued through Citibank for $4,500,000.00 contributed by Messrs. Maxwell, Gold and Edson.[7]

**4.** Mr. Maxwell owns 25% of the stock. Mr. Frank and his group, which includes Mr. Kramer, owns 25% of the stock and Messrs. Jebrock and Wallach each owned 5% of the shares. I note that on his personal financial statement, dated July 1, 1986, Mr. Jebrock reported that he owned 10% of Anglo Swiss. Accountant's Report at 3. On February 16, 1987, Jebrock purchased 2% of the stock held by Wallach. MJ 182.

Additionally, I note that Mr. Jebrock testified at his deposition that Frank and Maxwell forced him to sign the shareholders agreement and that he never received his stock certificates. Deposition of Michael Jebrock at 186, 188.

**5.** Although Mr. Jebrock denies ever holding a corporate office in Anglo Swiss nor attending or knowing of any shareholder or director meetings, and although he claims that he never saw a document listing him as a director, he asserts that he was told he was a director and intended to so serve. Deposition of Michael Jebrock at 90–91, 192, 235, 319; RM 47; MJ 79. I note that his own correspondence reveals he did so serve either as an active shareholder or director. In a letter from him to Robert Maxwell, dated April 17, 1987, he gave Maxwell his proxy to vote his shares of Anglo Swiss at two subsequently scheduled meetings. In addition, the record reflects that meetings transpired between Maxwell, Jebrock and Frank. Hearing Testimony of Steven Kramer, March 31, 1988 at 51. The issue remains open as to whether these meetings constituted "Board of Directors" meetings.

**6.** The following hearsay statements also shed light on Mr. Maxwell's role. For example, see the Deposition of Shirley Stier, at 43–46, in which she stated that while Maxwell had no knowledge of metals he said he "was going into the metal business," not just investing metals. *See also* Deposition of Carol Kahan at 35, 48–49 in which she recalled that although Maxwell never mentioned having any license or experience with securities or commodities, he wanted to become involved in the metals business.

**7.** Despite this alleged committment, there is some question as to whether Maxwell and his group actually put forth these funds. *See e.g.* Deposition of Michael Jebrock, at 236–37, 318, in which he stated that he never saw the alleged letter of credit and relied on assurances that it existed when he agreed to enter the agency agreement to sell the delivery program; *id* at 141–43, in which he stated that Maxwell informed him that "the five million dollars never existed." *See also* Hearing Testimony of Steven Kramer, dated March 30, 1988, at 103, in which he testified that despite representations that Maxwell was investing $5 million for 60% interest in the enterprise, the amount promised was never provided. *See also* plaintiffs' exhibit 32; Mr. Kramer's typed resignation letter to Bill Frank, dated May 18, 1987, in which he resigned from his position as secretary and employee of AME and stated that one of the reasons he resigned was

> Mr. Robert Maxwell's breach of his commitment to provide additional capitalization for

Maxwell 30; Accountants Report at 30, Statement of Michael Wallach, dated October 23, 1987, at 9. *See also* MJ 70, a letter dated May 20, 1987 to Robert Maxwell in which Mr. Jebrock wrote that he relied on this representation which he entered the business. Mr. Jebrock also recalled Mr. Maxwell stating that since he was investing the capital, he would have full control and that he would make decisions with the assistance of his lawyers and accountants. Deposition of Michael Jebrock at 69–72. Thus, the facts reveal that Anglo Swiss is the corporate parent of AME, the shareholders and directors of the part and directors include defendants Frank, Maxwell and Jebrock, and the controlling force behind Anglo Swiss was Mr. Maxwell.

### iii. American Metals Exchange

AME, which was incorporated in the State of Delaware on February 24, 1986, and located in 1600 square feet[8] of office space in Millburn, New Jersey, is the wholly owned subsidiary of Anglo Swiss. Maxwell 27, Reynolds Ex. 2, Plaintiffs' Ex. 214, MJ 82, Hearing Testimony of Steven Kramer, dated March 30, 1988, at 96 and April 4, 1988, at 53.

### iv. Role of Bill Frank and Robert Maxwell

Defendant Bill Frank is listed as president of AME. Accountants Report at 35; Deposition of Carol Kahan at 46–47, in which she stated that "Frank was in charge of AME."

Frank had daily contact with Maxwell and met with Maxwell each Thursday in Maxwell's New York Offices.[9] Deposition of Carol Kahan at 80–81; Hearing Testimony of Carol Kahan, dated March 28, 1988, at 53 and March 29, 1988, at 101–02. Although Frank made the day-to-day decisions, I find that Mr. Maxwell made all

the company, which commitment was a material inducement and part of the consideration for my joining the company.

**8.** The office was staffed by 6–15 sales people who manned sixteen banks of telephones. *See* Hearing Testimony of Steven Kramer, dated March 30, 1988 at 96, 105, in which he described it as a boiler shop operation. For description of a boiler shop firm, *see, e.g., CFTC v.*

major decisions, especially those which involved large sums of money. Deposition of Helen Reynolds at 138–39, 158, 160; Hearing Testimony of Steven Kramer, dated March 31, 1988 at 5; MJ 74, a letter on TWM stationery from Jebrock to Maxwell, attached to a projected profit and loss statement for AME.

At his deposition, Jebrock stated that while he did not know if Maxwell was a shareholder or officer of AME, he stated "I know he controlled the company." Deposition of Michael Jebrock at 725. Jebrock also testified that Maxwell informed him that all management, accounting and legal decisions were to be made in Maxwell's offices. *Id.* at 92, 398, in which he stated that all offices of AME were responsible to report to Maxwell as to all operations. Similarily, Maxwell monitored the operations himself. *See,* for example, Hearing testimony of Carol Kahan, dated March 28, 1988, at 49 and her deposition testimony at 82, in which she stated that Maxwell required her to contact AME on a daily basis regarding closing prices on the metals market, AME's sales figures, contracts sold, value of the contracts and money received.

The documentary record clearly supports a finding that Maxwell controlled AME. For example by letter to Bill Frank, Mr. Maxwell informed him that:

> ... any memos to American Metals, Lead Investment Corp., or FC & M Corp. are to be sent in draft form to this office for approval.

RM 21. "This office" refers to Maxwell's New York office. In addition, by memorandum from Hilarie Frank to Bill Frank, dated September 22, 1986, Ms. Frank wrote that:

> 1. A copy of all internal memos referring to corporate policy must be approved by [Mr. Maxwell].

*United States Metals Depository,* 468 F.Supp. 1149, 1157 n. 32 (S.D.N.Y.1979).

**9.** Ms. Kahan testified that one of the matters discussed at these weekly meetings was the money ARC or AME owed the other. *See* her deposition and hearing testimony cited in the text.

2. Before you put any proposals (to M. Jebrock (TWM)) ... in writing, Maxwell *must* go over 'everything' with you.

RM 22 (emphasis in original).

Finally the exhibit marked RM 46 reflects Mr. Maxwell's control with regard to Anglo Swiss and AME. After Jebrock and Maxwell sold their 10% share of Anglo Swiss,[10] *see* MJ 99; MJ 100; Deposition of Michael Jebrock at 323, by letter dated April 10, 1987, written on AME stationery, Mr. Maxwell informed Mr. Jebrock that:

The Board of Directors had decided, based on your continued committment to American Metals Exchange, Ltd. (Anglo Swiss) to re-issue five (5) shares of the Anglo Swiss stock back to you that were returned from the Lead Investment Transaction.

*See also* MJ 101.

Thus, the wholly owned subsidiary of Anglo Swiss offered a program whose daily operations were controlled by Bill Frank but whose major decisions were made by Robert Maxwell.

### v. The Sales Agents: Transworld Metals and FC & M

Since May 2, 1986, AME itself and through its sales agents engaged in the business of offering and selling investments in precious metals pursuant to a sales contract known as the "Equity Building Program" ("EBP"). Hearing Testimony of Steven Kramer, dated April 4, 1988, at 14. The mechanics of this program will be discussed *infra* in Part B. This program was sold through sales agents in New Jersey, Florida and California. Reynolds Ex. 2; MJ 68; Deposition of Michael Jebrock at 682–83.

Defendant FC & M was the New Jersey sales branch of AME, located in the Millburn, New Jersey, offices. Hearing Testimony of Steven Kramer, dated April 5, 1988, at 14–18. In addition, at least five sales agents had offices at 3111 University Drive, Coral Springs, Florida. These entities were: Defendant Transworld Metals,[11] American Capital Preservation, Richard E. Marchant, Inc., Kashouty & Associates, and Bob Barouxis, Inc. TWM and American Capital shared suite 710, Bob Barouxis, Inc. was next door, Marchant was in suite 514, and Kashouty was in suite 610.[12] *See* letter to Rene Champagen from Michael Jebrock, dated June 9, 1983, on TWM stationery; Gladden Ex. 4; Deposition of Michael Jebrock at 625–26; Hearing Testimony of Steven Kramer, dated April 5, 1988, at 17–18, 23, 25.

### vi. The Role of Michael Jebrock

Michael Jebrock is president[13] and 100% owner of TWM,[14] which started business in April of 1986. Maxwell 27; Accountants Report at 29, 35; and Ex. L thereto; MJ 180; Deposition of Michael Jebrock at 487; Ex. F to Deposition of Robert Maxwell. In addition, although he contends that he was never an employee of AME or Anglo Swiss, there exists employment agreements signed by Mr. Jebrock. MJ 84; MJ 198, Deposition of Michael Jebrock at 256–57; Accountants Report at 30. While these agreements were not executed by either corporate entity, other evidence suggests that Jebrock had some control over the activities of AME. For instance, there exists AME stationery with the address "3111 University Drive, Suite 300, Coral Springs, Florida,"[15] a suite once occupied by TWM.

10. In exchange for the stock, Maxwell issued Wallach and Jebrock a $100.00 check from the Anglo Swiss account. Deposition of Michael Jebrock at 323.

11. The Anglo Swiss shareholders agreement specifically describes TWM as a Florida Company owned by Michael Wallach and Michael Jebrock.

12. Other sales agents include American Commeratives, Inc., American Equity preservations, Bedon Tangibles, R. Dean Cunningham, United Metals Corp., Siegal Investment Co. and/or Ho-

ward Segal Inc. *See* Hearing Testimony of Steven Kramer, dated April 5, 1988, at 14–18.

13. Mr. Jebrock admits he has no license to trade securities or commodities. Deposition of Michael Jebrock at 10.

14. I note that Mr. Jebrock testified at his deposition on April 6, 1988, at 20, that he owned only 50% of TWM. *See also* his Deposition at 347, 685.

15. At one time, TWM was in suite 300 and occupied 13,000 square feet of the building. In

MJ 189. *See also* MJ 83, a memorandum from Michael Wallach to all managers and account executives, dated September 5, 1986, on TWM stationery instructing that all documents regarding investment rollovers were to be xeroxed and sent to AME at the Coral Springs address it shared with TWM. Relatedly, a photograph of the building located at 3111 University Drive in Coral Springs appears on the cover of the AME sales brochure. Hearing Testimony of Steven Kramer, dated April 4, 1988, at 54.

Not only was AME located in the exact location as TWM, but various documents suggest that Mr. Jebrock was perceived as an officer of AME. First, in a promotional brochure developed for the solicitation of new sales agencies, Mr. Jebrock was listed as treasurer of AME. Ex. 6 to the Declaration of Helen Reynolds, which is attached as Ex. L to Accountants Report. Second, on a letter prepared on AME stationery with the 3111 University Drive address, in which new clients were welcomed, Mr. Jebrock signed as the Vice President of American Metals.[16] MJ 94; Accountants Report at 35. Third, in a memorandum of understanding between Maxwell and Jebrock, which Jebrock asserts never came to fruition, *see* Deposition of Michael Jebrock at 74, Mr. Jebrock was to have agreed to serve as President of Ameican Metals as well as receive 5% of the ownership of AME upon execution of the agreement and 5% would have been placed in reserve for later distribution.

Fourth, the record reveals that Mr. Jebrock prepared and forwarded the projected profit and loss statement of AME for the period of August 1, 1986 through December 31, 1982, to Mr. Maxwell in care of Contract Furnishing & Systems, Inc.

Fifth, Mr. Jebrock was in daily contact with the New Jersey headquarters of AME as a result of his presidency of AME's largest sales agent as well as his role in AME Itself. Deposition of Helen Reynolds at 77.

Thus, the above demonstrates not only Mr. Jebrock's control of TWM, but also his role in AME.[17]

### vii. Amalgamated Redemption Center

ARC [18] is a New York corporation which was established to act as an "independent" third party agent for liquidating the investment contracts.

### viii. Role of Robert Maxwell

The record establishes that Mr. Maxwell controlled ARC.[19] Statement of Michael Wallach, dated October 28, 1987, at 8; Deposition of Michael Jebrock at 508; Deposition of Helen Reynolds at 141. First, his signature as Robert Lebovich appears as the signatory on AC's checking account, Plaintiff's Ex. 209, as well as on an ARC check to the Internal Revenue Service, dated January 30, 1987.

Second, his signature appears on an application for a safe deposit box, dated October 12, 1986, and related correspondence, including a letter regarding the placement of metals therein. SS 146B. Third, Ms. Kahan testified, and the documentary evidence reflects, that Maxwell signed numerous letters to ARC clients under the name Robert Lebovich. RM 24; Hearing Testi-

---

addition, TWM leased 1500 square feet on the sixth floor. Gladden Ex. 4, Deposition of Michael Jebrock, dated April 6, 1988, at 30.

**16.** Mr. Jebrock denies that he served as Vice President to AME. Deposition of Michael Jebrock at 297.

**17.** Mr. Jebrock contends that although Mr. Maxwell was never an officer, director, shareholder or employee of TWM, Maxwell "wanted a piece of the business," which Jebrock says he never received. Deposition of Michael Jebrock at 146, 150; 685–86.

**18.** The offices of ARC are located at 145 E. 57th Street, New York, in space Maxwell leases for two of his other enterprises, Contract Furnishing and Systems and RPM. Deposition of Carol Kahan at 50–51, 69. Although ARC had its own phone line, it did not have a separate area expressly designated as its own until June 1, 1987, at which time ARC's operations moved to 885 3rd Avenue, New York, New York, allegedly because CF & S and, ARC both needed more space. Deposition of Carol Kahan at 65; Deposition of Shirley Stier at 61.

**19.** According to the Accountant's Report at 35, Maxwell is a shareholder of ARC under the name of Robert Lebovich.

mony of Carol Kahan, dated March 28, 1988 at 39. Fourth, the law firm of Baron & Baron billed Robert Maxwell for the incorporation of ARC. SS 147; *see* Hearing Testimony of Carol Kahan, dated March 29, 1988, at 33. Fifth, not only did the Lebovich signature appear on such documents, but Maxwell was also listed as the contact person for those interested in hiring ARC as a third party delivery agent. *See* MJ 73.

Sixth, Carol Kahan, who was hired by Maxwell as his personal assistant in response to an advertisement placed by RPM,[20] another one of Maxell's endeavors, was placed on ARC's payroll.[21] She was primarily responsible for facilitating all liquidations. Deposition of Carol Kahan at 12, 14–19; Affidavit of Shirley Stier, at ¶¶ 3, 6; Deposition of Shirley Stier, dated March 21, 1988, at 33, 46, 90; Plaintiff's Ex. 211; Hearing Testimony of Carol Kahan, dated March 28, 1988, at 32 and March 29, 1988, at 174; Maxwell 19.

Seventh, in June of 1987, Maxwell offered to sell ARC to Ms. Kahan as he perceived his association with the company to have been inappropriate. Deposition of Carol Kahan at 130–31; Hearing Testimony of Carol Kahan, dated March 29, 1988 at 3. Ms. Kahan also asserts that as part of his offer to sell ARC to her, he promised to indemnify her for any legal liabilities she may have suffered as its owner. Deposition of Carol Kahan at 132.

Mr. Frank also had a relationship with ARC. Specifically, he trained Ms. Kahan to perform the liquidations and frequently assisted her with inquiries received from ARC clients. Deposition of Carol Kahan at 37–39, 51–52, 58.

Thus, Mr. Frank also had a significant relationship with the operations of ARC.

B. *The Investment Scheme*

Pursuant to this investment scheme, from May of 1986 through June of 1987, approximately 2000 investors purchased a specific quanitity of precious metals at a set price per ounce, which was established when the investment contract was entered.

In order to participate in the program, customers initially paid AME 30% of the total contract purchase price. Half of this amount, or 15% of the total constituted an administrative fee,[22] retained by AME. The other half of the amount served as a down payment which was applied toward the total purchse price. *See, e.g.,* Deposition of Michael Jebrock at 401.

Following the initial payment, the investor had two years to pay off the remaining balance of the purchase price of the metal and purportedly either have the metal delivered or effect an offsetting transaction through which the investor who wished to liquidate his metal would be referred to a third party who contracts with the investor to act as his agent to accept delivery of the metals, remit funds due on the purchase price and send the investor the remaining

---

**20.** RPM is an abbrievation for Robert and Phyliss Maxwell. Phyliss is Maxwell's wife. Deposition of Carol Kahan at 2.

On at least one occasion, Ms. Kahan used RPM stationery for a cover letter to an enclosed newsletter sent to Mr. Jebrock. Maxwell instructed her to call Jebrock and to tell him to tear it up. Hearing Testimony of Carol Kahan, dated March 28, 1988, at 43–44.

**21.** *See also* Deposition of Carol Kahan at 49–50 in which she stated that she was on ARC's payroll, but received her benefits from Contract Furnishings & Systems, another one of Maxwell's businesses.

**22.** According to the report of the accountant, at 14, up to 80–90% of this administrative fee constituted commissions received by the sales branches. In the aggregate, btween May 1, 1986 and June 30, 1987, $21 million "in commissions were paid by AME" to its sales agencies, of

which $5.2 million was received by TWM. *Id. See also* Statement of Michael Wallach, dated October 23, 1987, at 53, in which he stated that approximately $6 million were transferred from AME to TWM during the course of the operation.

According to Mr. Jebrock, however, the commission structure was set up as follows: If the sales of a branch were less than $60,000 per month, the branch would receive 25% of the administrative fee. If the sales were between $60,000 and $80,000 per month, the branch would receive 26% of the fee. For sales between $80,000 and $100,000 per month, the branch would receive 27% of these fees, and if over $100,000 the branch would receive 28% of the fee. In addition, sales managers received a 5% override on what the salespersons sold. Deposition of Michael Jebrock at 401.

profit. *See, e.g.,* Hearing Testimony of Carol Kahan dated March 28, 1988, at 20. In consideration for these services, the third party would generally retain a fee in the amount of 2.5% of the contract and charge an additional fee for handling the metals. The record reveals that all but one of these liquidations has been through ARC. Deposition of Hilarie Frank at 8–9; Exhibits 5 and 6 attached to Plaintiff's reply brief, submitted February 2, 1988.

AME sold this investment program over the telephone through sales offices located in New Jersey, California and Florida.[23] I note that approximately 78% of the contracts were sold by TWM. *See, e.g.,* Deposition of Michael Jebrock at 219; MJ 78; Hearing Testimony of Steven Kramer, dated April 4, 1988, at 14.

In addition to telephone solicitations, AME and its agents distributed a brochure that described the program and the alleged risk free nature of the investment. *See. e.g.,* Exhibits attached to Brief of State of Florida; Plaintiff's Hearing Ex. E; RM 60. The record reveals that Messers. Maxwell, Jebrock, Frank, and a respresentative of an advertising agency, James Farrell, met in Maxwell's New York office to develop the brochure. Statement of Michael Wallach, dated October 23, 1987, at 16–17; Deposition of Michael Jebrock at 91.

While Mr. Jebrock mimimizes his role in the development of the brochure, it appears that his corporation, TWM was aware of the need for "a credible brochure" and that he introduced Mr. Farrell to Mr. Maxwell. Deposition of Michael Jebrock at 393, 505.

**23.** While there is no evidence that sales branches were set up outside these three states, representatives of the AME program were prohibited from soliciting in the following states: Maine, Missouri, Montana, Nevada, North Dakota, and Wisconsin. *See* MS 124, 125, 127, MJ 88, 89, 90, 91, 92 185; RM 61, 61, 87; Deposition of Michael Jebrock at 265–67, 285.

**24.** As noted previously, the building which appears on the cover of the brochure houses, *inter alia,* Jebrock's company TWM.

**25.** On this point, Mr. Jebrock stated that the sales management, including all sales managers at TWM, "probably [have] well over a hundred and twenty-five years" experience in precious

Moreover, Mr. Jebrock did participate in discussions about its general makeup.[24] *Id.* at 100, 575–76. It appears, however, that Mr. Maxwell made the ultimate decision as to the contents and design of the brochure. *Id.* at 98. Specifically, the brochure states that:

> The Equity Building Program from American Metals Exchange offers a proven method for gaining financial leverage ...
>
> \* \* \* \* \* \*
>
> The Equity Building Program is not a futures contract ... so you don't have to worry about margin calls or forced liquidations during temporary market declines.... It is not a finance program ... you pay no interest charges on your unpaid balance ...
>
> \* \* \* \* \* \*
>
> Although this type of purchase program has been available for less than five years, thousands of Americans across the country have proven its success....
>
> \* \* \* \* \* \*
>
> ... Precious metals is our only business, and our management represents more than seventy-five years of experience.[25]
>
> \* \* \* \* \* \*
>
> The major portion to down payments received from our clients is placed in government-backed securities and large "omnibus" hedging accounts which are maintained on the leading commodity futures exchanges.[26]
>
> \* \* \* \* \* \*

metals. Deposition of Michael Jebrock at 117, 119, 120–21. *See also* Hearing Testimony of Steven Kramer, dated April 14, 1988, at 20, 60 where he stated that the 75 years refers to the sales and business experience of all parties involved, not just their metals experience.

**26.** The evidence suggests that AME used funds to invest in future contracts that were both above and below the cash prices. Hearing Testimony of Steven Kramer, dated March 31, 1988 at 67, 90 and April 4, 1988 at 26. In addition, money was used, *inter alia,* for loans to Robert Maxwell, instead of being invested in certificates of deposit, treasury notes or for the purchase of metals. *Id.* at 25. *See also* Plaintiff's Ex. 217, the handwritten resignation of Steven

Your fixed purchase price is based on the current cash market price of your metals.... We confirm the price to you upon receipt of your funds.

\* \* \* \* \* \*

At your request we will put you in touch with *independent* third party agents who will assist you in taking delivery and selling your metals (emphasis added).

\* \* \* \* \* \*

American Metals assure[s] delivery when ... request[ed] ... by hedg[ing] air delivery requirements on the leading commodity exchanges.

\* \* \* \* \* \*

As a convenience to our clients, we try to maintain relationships with "third party" agencies which will offer [assistance to those who wish to take delivery of their metals but do not choose to pay cash for the balance due].

\* \* \* \* \* \*

Initial payment represent[s] ... down payment [and] a one-time administrative fee; this covers sales commissions, carrying charges and *all* othe costs of your participation. (emphasis added).[27]

The above excerpts represent assertions which describe defendants' ability to fulfill the EBP contract. The program purported to offer a relatively risk free investment without margin calls or forced liquidations, which are normally posed by short-term price fluctuations. The document further asserted that AME was staffed by experienced professionals who assisted in the execution of a proven and historically profitable investment program. According to the brochure, customers' downpayments were invested in government backed securities [28] and, at the conclusion of the contract, "independent third parties" were available to take delivery of the metals on behalf of the customers.

Although the brochure, promotional pamphlet to solicit new dealers and order forms all state that the program requires

Kramer to Bill Frank, dated May 7, 1987 in which he states, *inter alia:*

I have previously expressed dissatisfaction with the use of funds to be applied to the market being instead used to finance other projects, like mortgages.

Specifically, the record reveals that Mr. Maxwell executed two promissory notes in favor of AME on November 30, 1986, in the amounts of $100,000 and $347,000 respectively. Maxwell 4, 5 & 6; Deposition of Michael Jebrock at 358. Although there is some evidence that suggests these loans were repaid, *see* Maxwell 6, 7; RM 57; Deposition of John McNamara at 18, Deposition of Michael Jebrock at 842; Hearing Testimony of Carol Kahan, dated March 28, 1988 at 48. I note that the court has only been presented with copies of five checks that are marked in payment of these loans, totalling $21,355.40. *See* Schedule 5 of the Accountants Report.

In addition, Maxwell's son, Arthur, on behalf of 54–56 Realty Corp., borrowed $300,000 to purchase six units in a condominum complex located in Boston, Massachusetts. RM 49, 52, 53, 54; Deposition of Michael Jebrock at 362. Mr. Maxwell personally guaranteed this loan. *See* RM 49. Once again, there is evidence to suggest that this mortgage was repaid. RM 58; Maxwell 32. There is, however, only evidence that Arthur Maxwell wired only $98,820 to AME. *See* Schedule 9 of Accountants Report as well as the wire transfers. In addition, it appears that ARC owned shares in 54–56, from which Mr. Maxwell purchased shares for $22,-500. Maxwell 15; RM 52.

Maxwell also borrowed $158,000 from Anglo Swiss in October of 1986, most of which had been repaid. Schedules 4, 5 & 8 to Accountant's Report.

In sum, the Accountant reports that Mr. Maxwell received $747,400 in loans and mortgages and actually repaid $115,904. *See also* Hearing Testimony of Steven Kramer, dated April 4, 1988, at 25, 37, 51 in which he stated that Maxwell borrowed approximately $800,000 over three transactions which occurred from November 1986 thorugh February 1987. *See also* his testimony of April 5, 1988 at 41.

27. I also note that on the brochure, AME lists the law firm of Phillips, Nizer, Benjamin, Keim & Ballon. Martin Stein, Maxwell's counsel, formerly a partner of that firm, states he never reviewed the brochure despite the fact his firm's name appears thereon. Deposition of Martin Stein at 159. *But see* Deposition of Michael Jebrock, dated April 6, 1988 at 31, 33, which states that Mr. Stein was "proud to have" his name on the brochure and even after Stein left Phillips, Nizer, Maxwell continued to use that firm and so the name remained on the brochure.

28. As stated previously, it was represented that this money was invested in treasury bills to be used as a margin to buy futures to hedge the company's positions. Most of the money was not so invested. Hearing Testimony of Steven Kramer, dated April 4, 1988 at 61. *See also* note 24, *supra.*

actual delivery [29] of the metals to the customer or its third party agent upon liquidation and thus was not promoted as a security [30] of futures contract or option. MJ 68; Maxwell 25; Hearing Testimony of Steven Kramer, April 4, 1988, at 22; Deposition of Michael Jebrock dated April 6, 1988, at 22–23; Deposition of Michael Jebrock at 389–90, 669; MJ 110. There is evidence to suggest that no physical transfer of metals occurred.

For example, although she testified that in some instances ARC received physical delivery of metals for non-AME customers, Ms. Kahan stated that she was unaware of any metal received for AME customers. Hearing Testimony of Carol Kahan, dated March 30, 1988, at 59–63. Specifically, during the hearing, counsel asked her to review Plaintiff's Exhibit 11 and stated:

Q. I direct your attention to the language in the letter which reads:

'In an effort to keep you informed regarding your recent liquidation request, please be advised that we received a shipment of metals from American Metals Exchange and your price has been fixed as follows.'

then there is a chart of various prices. Do you see that language?

A. Yes.

Q. Can you tell the court whether or not in fact metals had been received pursuant to this letter?

A. Not that I'm aware of.

Q. You're not aware that there were metals received pursuant to that letter?

A. There were no metals received so far as I'm aware.

*Id.* at 59–60.[31] She testified further that the nontransfer of metals was "approved by Frank and implicity by Maxwell." *Id.* at 61.

During the hearing, Mr. Kramer also explained that he became aware that physical metal was not transferred to ARC on behalf of AME customers despite information he was given to the contrary. His testimony is as follows:

Q. Was any metal being bought?

A. ... with ARC, I was initially told that metal was being moved back and forth. Might have been the same metal being moved back and forth, but metal was changing hands

\* \* \* \* \* \*

[In fact, however], [p]eople were being paid that way but it was all done on paper, no metal was changing hands. So the customers were getting paid what they should have been getting paid but it was without the exchange of metal.

Q. So it was just paper?

A. Yes.

Q. As a rule, was physical metal involved in the liquidation?
A. No.

Hearing testimony of Carol Kahan, dated March 28, 1988 at 54. On that day, however, she did testify "at one time" she said she saw certificates which represented metals. *Id.* at 54–55. Yet on the following day, the following colloquy ensued:

Q. Was there any metal actually transferred in connection with the [ARC] liquidation[s] ...?

\* \* \* \* \* \*

The Court ... You asked the witness whether she actually saw any metal, silver.
Mr. Hall ... Platinum. Any metal dealt with. May the witness answer the question.
The Court: Yes, I'll permit her to answer.
A. I never saw physical metal no.

Hearing Testimony of Carol Kahan, dated March 29, 1988, at 14.

---

29. As Ms. Wallach perceived it, "they weren't selling metals, they were selling a delivery program." Statement of Michael Wallach, dated October 23, 1987, at 20. *See also* Deposition of John McNamara, at 20 who stated that he knew Maxwell's business was "a future type sales program in precious metals, predominantly silver, gold...."

30. *But see* a letter to Bill Frank from Martin Stein, Esq., mistakenly dated as January 12, 1986, (it should have read "1987") which states that his law firm Phillips, Nizer:

... agreed to do all legal work necessary to register a proposed investment contract for your program with the SEC and to qualify the broker-dealer, broker-dealer which you [AME] were about to purchase (Equerry) in the remaining 38 states where it is not presently qualified.

MS 233; Deposition of Martin Stein at 125–26. A copy of this letter was sent to Robert Maxwell.

31. At other points during the hearing she testified as follows:

Q. ... did you find that strange or is that the way it works?

A. Obviously, it was not the way it was presented to me originally, I only became aware of that after the fact.

Q. Was it presented to the customers that way, namely that metal would actually be purchased?

A. Yes, ... when the customers were sold, they weren't told that there was an inventory of physical metal, they were told they were being hedged in the futures market but that physical metal would eventually be delivered to a third-party of their choice.

Q. "Hedged in the futures market," what does that mean?

A. Buying enough metal in the future contracts to cover physical deliveries so if the price rises in the case market for physical, you get an equal rise in the futures market to generate profits to your client.

Hearing Testimony of Steven Kramer, dated April 4, 1988 at 22, 29–33, 50 and April 5, 1988 at 6–7.[32]

In addition to this testimony, persuasive support for the assertion that delivery of metals rarely occurred is revealed by the minimal amount of metals found in the search of AME's offices. The evidence voucher from the search of AME reveals that 25–one hundred ounce bars of silver, 10 fifty ounce bars of silver, three ten ounce bars of silver, three one ounce bars of gold and four one ounce silver key chains were found on AME's premises. Given the minimal amount of metal at AME, it is inferrable that little was available for transfer to ARC. Ex. C. to Accountant's Report. Thus despite assertions to the contrary, metals were not transferred from AME to ARC, and thus the program involved mere paper transactions.[33]

When a client is ready to sell his metals bought pursuant to EBP, he would inform an account executive or a third party agent of his desire to sell. In the instance of a third party agent, the agent would then call AME to confirm the purchase price and the amount of metal involved. Deposition of Michael Jebrock at 272, 376. Thereafter, ARC's fee (2½% of the value of the metal plus a per ounce charge [34]) was calculated. Hearing Testimony of Carol Kahan, dated March 28, 1988, at 21. ARC then forwarded the contract price to AME,[35] deducted its fee, and forwarded the remainder to the customer or reinvested the profits, in which case the proceeds would be sent to AME.[36] Id. at 40–41, 79–80; Deposition of Carol Kahan at 24.

Ms. Kahan, who was hired by Maxwell and trained by Bill Frank, facilitated all liquidations for ARC.[37] See Deposition of

---

**32.** Elsewhere in his testimony he stated that the transfer of physical metals would distinguish this program from a futures contract. Hearing Testimony of Steven Kramer, dated April 4, 1988, at 49–52. He stated that:

Metal had to be delivered to someone who had the ability to get out in to the market place and sell the metal, someone who could act as a wholesaler. We weren't equipped to do that. Metal had to be delivered because without metal being delivered, it was a paper transaction. It would then be considered a futures contract.

Id. at 22. See also discussion infra with respect to futures contracts.

**33.** I note that when the third party agent was Bank of Delaware or Wilmington Trust, rather than ARC, a physical transfer of metals occurred. Hearing Testimony of Steven Kramer, dated April 4, 1988, at 34–35.

**34.** The original per ounce service charge was set at 10¢ per ounce of silver and $5.00 per ounce of gold, platinum or palladium. Hearing Testimony of Carol Kahan, dated March 28, 1988, at 21.

**35.** Recall that it was contemplated that ARC would buy the metals from AME on behalf of the customer and take physical delivery thereon. Deposition of Michael Jebrock at 272, 276; Hearing Testimony of Steven Kramer, dated April 5, 1988 at 29; Deposition of Carol Kahan at 40.

**36.** Ms. Kahan was specifically instructed not to use the term rollover to describe a reinvestment and was told that her liquidation worksheet should not include any reference to AME. Deposition of Carol Kahan at 46; Hearing Testimony of Carol Kahan, dated March 28, 1988 at 24.

**37.** Prior to the hiring of Ms. Kahan, Shirley Stier had facilitated a few redemptions for ARC in the Millburn, New Jersey offices of AME. Deposition of Shirley Stier at 29–30. At that time, Steven Kramer maintained the liquidation information. When Ms. Kahan was hired, she

Carol Kahan at 37, 39, 51 (from September through November of 1986). Ms. Kahan stated that from September through November of 1986, she spent 70% of her time doing ARC related work. When the market slowed from November 1986 through February 1987, Ms. Kahan spent only 45–50% of her time doing metals work and the rest of her time was spent on matters related to Maxwell's other enterprises. Deposition of Carol Kahan at 65–67, 72, 84–87.

In late April of 1987, the metals market experienced great fluctuations. Specifically, on April 27, 1987, the cash market opened at $11.25 and closed at $7.00. Hence, the market fell very quickly and as a result no sellers were permitted on the trading floor. Hearing Testimony of Steven Kramer, dated March 31, 1988, at 66. During this period, the COMEX increased its margin requirements. *Id.* at 67. Rather than taking available profit, however, Maxwell allegedly decided to risk the market swing and assured Frank that he would cover any losses.[38] Deposition of Carol Kahan at 124–25; Hearing Testimony of Carol Kahan, dated March 28, 1988, at 71.

As the company was not fully hedged, that is, it lacked the "financial wherewithal that to cover the position [in the market] with its own pocket book" as opposed to that of the client, Hearing Testimony of Steven Kramer, dated March 30, 1988, at 108 and since the company had not placed any stop loss orders,[39] Hearing Testimony of Steven Kramer, dated March 31, 1988 at 88, the company suffered a loss in the hedge account. Deposition of Michael Je-

brock at 123. Because of this loss, and given the absence of other financial sources, it appeared that AME used incoming client money to operate. Hearing Testimony of Steven Kramer, dated March 31, 1988, at 73. While this essentially reflected that AME was no longer financially secure, AME continued to sell the investment program, with very few positions hedged. Hearing Testimony of Steven Kramer, dated April 5, 1988, at 10. *See also* Deposition of Michael Jebrock, dated April 6, 1988, at 127, in which he stated that TWM continued to distribute AME's brochure until mid-June of 1987.

During the course of this market fluctuation, numerous investors sought to liquidate their contracts. As a result, a backlog developed. Mr. Maxwell asked Ms. Kahan, who had just returned after a three month hiatus, to help with a large backlog of liquidations [40] at the Millburn offices of AME. Deposition of Carol Kahan at 111, 113, 117; Hearing Testimony of Carol Kahan, dated March 28, 1988, at 69.

Pursuant to this request, in May of 1987, Ms. Kahan went to AME offices, reviewed AME–prepared computer spread sheets, verified liquidation computations, typed liquidation letters, and, with the assistance of Pamela Perrin and Bell Frank, sent out checks and letters to clients who sought to liquidate their AME contracts. Deposition of Carol Kahan, at 111, 113, 117; Hearing Testimony of Carol Kahan, dated March 28, 1988, at 65–71. During this period, Maxwell occasionally called the Millburn office from New York to obtain liquidation infor-

recalled that Mr. Kramer was "happy to have the [liquidation] spread sheet off his desk." Deposition of Carol Kahan at 106.

**38.** In his handwritten letter Resignation to Bill Frank, dated May 5, 1983, marked as plaintiff's Ex. 217, Steven Kramer wrote:

The company has ... adopted recently, a wait and see attitude on entering the metals market in the hedge account, which I am unable to accept. The current flow of incoming and outgoing dollars is also inconsistant [sic] with what I believe needs to be done to honor our committments. Although I received assurances that all funds are being assigned as they are supposed [sic], I am still unable to give my support to the actions taken.

**39.** A stop loss order requires that when the market hits a particular pre-set price, the commodity would be sold at the price set at the next available opportunity to sell. Hearing Testimony of Steven Kramer, dated March 31, 1988, at 88.

**40.** The backlog, totalling approximately $600,-000, was allegedly the result of inexperienced help and the vast number of liquidation orders placed in response to the changes in the metals market. Deposition of Carol Kahan at 117; Hearing Testimony of Carol Kahan, dated March 28, 1988, at 71–81.

mation for specific ARC customers. Deposition of Carol Kahan, dated March 28, 1988, at 118.

After approximately one week in New Jersey, Ms. Kahan returned to Maxwell's offices at 145 E. 57th Street, New York, New York, to continue filling liquidation orders. *Id.* at 122. Shortly thereafter, Maxwell instructed her to stop sending additional liquidation checks, presumably because of insufficient funds and despite reassurances that he was recommitting himself to AME. Deposition of Carol Kahan at 128–29; Hearing Testimony of Carol Kahan, dated March 28, 1988, at 79. Ms. Kahan testified that Maxwell liquidated bonds and transferred approximately $200,000–300,000 to AME who then transferred amounts to ARC to pay off customers. *Id.* at 79–80. *See also* Schedule 5 to the Accountants Report which reflects a $15,000 wire transfer to ARC in May of 1987. *But see* Deposition of Michael Jebrock at 141–43, in which he recalls Maxwell saying that he was raising funds by selling mortgages and real estate, but in fact this was not fresh capital, rather it was just repayment of loans made to Maxwell by AME.

In the Spring of 1987, the Division of Banking of the State of Florida and the Bureau of Securities for the State of New Jersey commenced investigations with respect to the propriety of the above described program, as well as the conduct of AME, ARC and TWM. The state investigators found:

1. All shares of AME were owned by Anglo Swiss and among the eight shareholders of Anglo Swiss were Bill Frank, Robert Maxwell [41] and Michael Jebrock.

2. AME had two wholly owned subsidiaries: Lead Investment Corporation of America and FC & M Investment Corp.

3. Michael Jebrock is President of TWM as well as a director of TWM and Anglo Swiss. In addition, he had an employment contract with AME which provided for compensation in an amount equal to 20% of the net pre-tax profits.

4. Significant omissions and misrepresentations were contained in the promotional brochure [42] with respect to AME's experience in the precious metals business, fees associated with the program and the security of the client's investment. For instance, of the approximately $7.8 million received in the purchases, no more than $300,000 were invested, on the average, in government securities, at any one time. Relatedly, while AME asserted that it purchased exchange traded futures to protect the contractual prices quoted, records revealed that no contracts were purchased to cover or hedge the investors' contracts.

5. TWM was a sales agency of AME and sold 78% of all of the AME's contracts.[43]

6. Most of the money placed in the accounts of TWM came from AME via wire transfers from, *inter alia*, New Jersey banks.

7. Robert Maxwell controlled ARC, a purported independent third party agent,

**41.** The accountant reported that Mr. Maxwell was the shareholder of A–S, AME's parent, as well as a shareholder and/or controlling force of ARC and AME. Accountant Report at 24.

**42.** *See also* Memorandum of Rene Champagne to his file, dated October 2, 1986, as well as Champagne Ex. 23, in which he listed the reported misrepresentations of AME regarding the years in and the size of its business as well as alleged work with and approval of various state authorities. *See also* Hearing Testimony of Carol Kahan, dated March 28, 1988, at 29 regarding the length of time the company was in business.

Interestingly, in Mr. Champagne's memo to her file, dated February 23, 1987, he noted that Mr. Frank claimed Mr. Jebrock was not official-

ly with AME, that the CFTC reviewed the hedging records of the company and AME had negotiated with the Securities and Exchange Commission ("SEC") regarding registration of the program. See Exhibit 6 to Deposition of Robert Maxwell. At his deposition, however, Mr. Jebrock denied ever hearing anyone tell Mr. Champage that AME was in the process of registering the program.

**43.** Approximately $4.5 million was transferred from AME to TWM from September 1986 through June 1987. This amount presumably reflects commissions on sales. In addition, TWM transferred $150,600 to AME during that period. Ex. L to Accountant's Report.

to which AME directed investors who sought to liquidate their contract.[44]

8. 597 of 598 of AME's contracts were liquidated via ARC. Specifically, AME sold the investment contracts for which the purchaser remitted 30% of the total cost and upon decision to sell the contractually purchased metals, ARC advanced the investors the funds to pay off the outstanding balance.

9. Because AME was not properly hedged, investors' futures contacts were liquidated without their consent. In addition, this improper hedging resulted in great financial loss to AME and caused AME to use the incoming funds of new customers to pay off obligations owed to preexisting customers.

10. At times, AME liquidated investment contracts at prices below the day's closing price listed on COMEX for the date the investor directed the liquidation.

11. Liquidations took place only during several days in May of 1987 rather than on the specific dates that investors had placed liquidation orders.

On this point it must be noted that by memorandum, sent to all branches by Hilarie Frank, dated May 21, 1987, regarding the liquidation procedure, Ms. Frank of AME explained that ARC reserved the right to fix the sale price of a metal up to three days.[45] MJ 76; Maxwell 17; Accountant's Report at 24 and Ex J thereto. As Ms. Kahan explained, Mr. Maxwell instructed her to use a three day spread and select the lowest price in the period as the price to pay off the customers.[46] Hearing Testimony of Carol Kahan, dated March 28, 1988, at 43, 45, 64.

These investigations and the conduct of, *inter alia*, AME, A–S, TWM, LIC and Messrs. Frank, Maxwell and Jebrock gave rise to the instant suit, the resulting amended complaint and request for interlocutory injunctive and ancillary equitable relief.

In support of their request, plaintiffs assert that defendants' conduct violated the CEA and thus, pursuant to that Act, the court should grant equitable relief. Specifically, plaintiffs assert that defendants' claims with respect to their ability to fulfill the allegedly risk free investment contracts were knowing misrepresentations of material fact, in violation of § 4(b) of the Act. Plaintiffs further contend that defendants' misappropriated funds in a scheme in which defendants converted new investors funds to pay off previous investors and defendants liquidated contracts at improp-

---

**44.** According to the report of the accountant, at 24, ARC was the only liquidating agency "suggested by AME" to its customers to facilitate the delivery and sale of metals. *See also* Deposition of Michael Jebrock at 165. Apparently, AME was ARC's only customer. Hearing Testimony of Carol Kahan, dated March 29, 1988 at 40, 75. AME provided lists of its customers to ARC. Reynold's Ex. 2. *See also* MJ 108, a memorandum to TWM, dated November 24, 1986 which stated that ARC was sending third-party agency agreements to all AME's customers. Prior to this, the brokers were instructed to call AME, not ARC regarding liquidations. *See* memorandum from Hilarie Frank to Michael Jebrock dated September 23, 1986; Deposition of Michael Jebrock at 505. *See also* Hearing Testimony of Steven Kramer, dated April 4, 1988, at 21, in which he stated that ARC handled over 95% of all AME liquidations. As a result, from May 1, 1986 through June 30, 1987, approximately $3.7 million was transferred from AME to ARC over the course of thirty-three transactions via corporate checks and wire transfers. On this basis, the accountant has concluded that the "source of substantially all of ARC's receipts" were funds transferred from AME. Account-

ant's Report at 24. *See also* Hearing Testimony of Carol Kahan, dated March 28, 1988 at 78 and Deposition of John McNamara, at 118, 124, both of whom testified as to the existence of the transfer of funds between ARC and AME.

I also note that the accountant reported that $1.9 million was transferred from ARC to AME in twenty transactions.

**45.** In response to this directive, by letter dated May 22, 1987, Michael Wallach informed Hilarie Frank that he believed that the clients should be notified of the use of the three day spread and have a right to cancel the transaction if they found the system dissatisfactory. MJ 183. Customers complained about the use of the three day spread as well as the use of "next day prices," described at *infra* Deposition of Michael Jebrock at 374, 510. Mr. Jebrock was told to direct all complaints to AME. *Id.* at 375.

**46.** *See also* Hearing Testimony of Carol Kahan, dated March 28, 1988, at 86 and March 29, 1988 at 10 in which she stated that Bill Frank instructed Pamela Perin to tell Ms. Kahan to use the metal figures for the day following the date of the clients liquidation order to set the price.

erly low prices, thereby trading beyond the authority granted by the investors. The plaintiffs assert that each defendant is liable under the CEA either as a principal of an agent and/or as an aider or abetter.

In response, each of the defendants contends that one or more of the following grounds require that the complaint be dismissed: (1) lack of subject matter jurisdiction, (2) improper service, (3) lack of *in personam* jurisdiction, (4) improper venue and the doctrine of forum nonconveniens, (5) failure to allege fraud in the particularized manner contemplated under Fed.R.Civ. P. 9(b), and (6) plaintiff's improperly amended complaint. Defendants further argue that injunctive relief should not issue because plaintiffs have failed to allege knowing or willful violation of the CEA and have made no showing of harm or proof of future violations. Defendants also assert that ancillary equitable relief should not be granted in the form of a freeze or disgorgement since there is no showing that the individual defendants personally benefitted from these activities.

## IV. CONCLUSIONS OF LAW

### A. *Subject Matter Jurisdiction*

Pursuant to 7 U.S.C. § 13–1, this court has subject matter jurisdiction of this controversy and the alleged violations of the CEA therein. In addition, the complaint reveals a federal question as it alleges a violation of an "act of Congress" and thereby presents a basis for subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Furthermore, as the claim involves "an Act of Congress regulating commerce," this court has jurisdiction under 28 U.S.C. § 1337. *Shelly v. Noffsinger*, 91 F.R.D. 263, 265 (N.D.Ill.1981).

■ Moreover, in the presence of a federal claim, the court may exercise pendent jurisdiction over the state law claims since the state claims in this case arise out of the same facts upon which the federal claim is based. *Carnegie–Mellon Univ. v. Cohill*, — U.S. —, —, 108 S.Ct. 614, 618–20, 98 L.Ed.2d 720 (1988); *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). *See also Kelly v. Cair*, 691 F.2d 800 (6th Cir.1980) in which the court recognized that exercise of jurisdiction over state claims is proper in a case in which the CEA serves as an independent basis of jurisdiction.

Thus, since alleged violations of the CEA present both a federal question and serve as an independent basis for jurisdiction, I find that I have subject matter jurisdiction to adjudicate this controversy and will exercise pendent jurisdiction over the state claims since they arise out of the same facts on which the federal claim is based.

### B. *Service of Process*

■ Defendants Jebrock and TWM claim that since they were served by an employee of the Comptroller of the State of Florida and since the state of Florida is a party to the suit, service was improper.

Rule 4(c)(2)(A) states that "[ ] summons and complaint shall ... be served by *any person who is not a party* and is not less than 18 years of age" (emphasis added). The term "any person" has been broadly construed so as to permit service by an attorney for the party, but not by the party itself. *Jugolinija v. Blue Heaven Mills, Inc.*, 115 F.R.D. 13, 15 (S.D.Ga.1986).

In this instance, defendant Jebrock and TWM were served by Lori Chase Douglas, senior financial investigator of the Office of Comptroller for the State of Florida. The pleadings reveal that, in this action, the Office of Comptroller represents the State of Florida. Thus, since the office is counsel to the party, state of Florida, I find that these defendants were not served by a party, but rather were served by an employee of its counsel.

Having received no other challenges to service, I find such was proper as to all newly named defendants.

### C. *In Personam Jurisdiction*

Since service has been properly effectuated, Rule 4(e) of the Federal Rules of Civil Procedure requires that the district court look to the long arm statute of the forum to determine the extent to which personal jurisdiction may be asserted over the nonresident defendants. *See Dent v. Cun-*

ningham, 786 F.2d 173, 175 (3d Cir.1986), quoting, Mark Daetwyler Corp. v. R. Meyer, 762 F.2d 290, 295 (3d Cir.1985); Henry Heide Inc. v. WRH Products Co., Inc., 766 F.2d 105, 108 (3d Cir.1985). New Jersey's long-arm provision, N.J.Civ.Prac. R. 4:4–4(c), provides for the exercise of personal jurisdiction over residents "to the uppermost limit provided by the United States Constitution." Avdel Corp. v. Mecure, 58 N.J. 264, 268, 277 A.2d 207 (1971). Thus, the defendants' amenability to a suit brought in this court must be judged by the due process standards expounded by the United States Supreme Court and the intermediate federal appellate courts. The due process analysis, as applied with respect to litigation which arises out of or is related to the defendants' forum related activities, requires consideration of whether the defendants could have reasonably expected to be hailed into the forum's court, whether defendants purposefully directed their activities at residents of the forum, and whether notions of fair play and justice militate in favor of the forum's exercise of jurisdiction over an action which results form injuries which arise out of or relate to those activities. See Heide, supra, at 108; Gehling v. St. Georges School of Medicine, 773 F.2d 539, 541 (3d Cir.1985); Burger King Corp. v. Rudzewicz, 471 U.S. 462, 473 n. 15, 105 S.Ct. 2174, 2182 n. 15, 85 L.Ed.2d 528 (1985); Helicopteros Nacionales de Colombia SA v. Hall, 466 U.S. 408, 414, 416, 104 S.Ct. 1868, 1872, 1873, 80 L.Ed.2d 404 (1984).

■ In International Shoe Co. v. Washington, 326 U.S. 310, 317, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945), the Supreme Court stated that the demands of due process "may be met by such contacts of the [nonresident defendant] with the state as make it reasonable, in the context of the federal system of government, to require the [defendant] to defend the suit which is brought there." For example, the forum court "does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be bought by consumers in the forum state." World

Wide Volkswagen v. Woodson, 444 U.S. 286, 297–98, 100 S.Ct. 559, 567–68, 62 L.Ed. 2d 490 (1980). Moreover, "parties who 'reach out beyond one state and create continuing ... obligations with citizens of another state' are subject to regulation and sanctions in the other state for the consequences of their activities." Burger King, supra, 471 U.S. at 473, 105 S.Ct. at 2182 (quoting Travelers Health Assn. v. Virginia, 339 U.S. 643, 647, 70 S.Ct. 927, 929, 94 L.Ed. 1154 (1950)). Thus, a defendant may reasonably anticipate being required to defend itself in out-of-state litigation in a case in which the defendant has deliberately engaged in significant activities within the forum state, created obligations between itself and residents of the forum and purposefully availed itself of the privilege of conducting business there and thereby invoked the benefits and protections of the forum's law. Burger King, supra, citing Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958). Hence, since the cause of action in this case arises out of the defendants' forum, rather than non-forum related activities, I must first determine, as required above, whether the defendants anticipated being haled into court in this forum. Gehling, supra, 773 F.2d at 541, (citing World Wide Volkswagen ).

■ I will first discuss the existence of personal jurisdiction with respect to defendants Jebrock and TWM. Jebrock and TWM are engaged in business with AME. Specifically, TWM was AME's largest selling agent of the EBP. Jebrock served as president of TWM and as an officer, shareholder and director of Anglo–Swiss, the company which owns 100% of the stock of AME. In addition, Jebrock was an important force in AME. AME had its principal place of business in New Jersey and existed to sell a product to, inter alia, residents of the forum state. Moreover, as the selling agent, Jebrock and TWM purposefully directed their activities and benefitted from solicitations of New Jersey residents. Specifically, numerous wire transfer of funds were transmitted from New Jersey bank accounts to TWM's Florida accounts.

Moreover, the mail and telephone were used to conduct investment transactions between AME and its sale agent TWM.

In light of the above conduct, it would be unfair "to allow [these defendants] to escape having to account [in this state] for consequences that arise proximately out of such activities.... [Furthermore], because modern transportation and communications have made it much less burdensome for a party sued to defend himself where he engages in economic activity, it usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity." *Burger King, supra,* 471 U.S. at 473–74, 105 S.Ct. at 2182–83 (citations and quotation marks omitted). Therefore, in light of the above described technological reality and given the state's interest in compensating its domiciliaries for injuries that arise from defendants contacts with the forum, and given plaintiffs' desire to proceed in an efficient manner, fair play and substantial justice support this court's exercise of specific jurisdiction in this over defendants Jebrock and TWM.

For similar reasons, this court may exercise personal jurisdiction over defendant Maxwell. Mr. Maxwell is also a shareholder and director of Anglo Swiss, the 100% owner of AME, and has actively overseen the operations of AME since its inception. *See* Affidavit of Carol Kahan. Maxwell apparently has conducted business through AME with the goal of soliciting business from residents of the forum. In addition, he reviewed and facilitated the preparation of the brochure which AME distributed to the public. Clearly, these brochures were directed toward soliciting business in the forum state and creating obligations between the corporate entity which he controlled and the residents of the forum. Since this litigation arises from or relates to such conduct, this court may also exercise specific jurisdiction over Mr. Maxwell in this case.

Moreover, contrary to defendants' allegations, I do not find that the doctrine of *forum non conveniens* requires dismissal of this case. Upon consideration of the

public and private interests articulated in *Gulf Oil v. Gilbert,* 330 U.S. 501, 508–09, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947), which guide my evaluation of the convenience of the chosen forum, I find that this forum is not "so completely inappropriate and inconvenient that it is better to stop the litigation in the place where it was brought...." *Norwood v. Kirkpatrick,* 349 U.S. 29, 31, 75 S.Ct. 544, 546, 99 L.Ed. 789 (1955) (citations and quotation marks omitted). *See also Piper Aircraft & Co. v. Reyno,* 454 U.S. 235, 257, 260, 102 S.Ct. 252, 266, 268, 70 L.Ed.2d 419 (1980). Although alternate forums exist (i.e., New York or Florida), I find that documentary evidence in this case can be easily brought to the forum. Moreover, witnesses who may be called on to testify in this case may include investors from states other than Florida and New York. In addition, the litigation of plaintiffs' claims can be efficiently handled in this forum without extraordinary administrative difficulties and without overburdening the defendants. Finally, deference to plaintiffs' choice of forum, *CFTC v. Savage,* 611 F.2d 270, 279 (9th Cir.1979), and the local interest in protecting potentially defrauded resident investors supports not dismissing this suit on convenience grounds.

### D. *Venue*

■ Pursuant to 7 U.S.C. § 13a–1, venue is properly laid in this court since the record reveals that the defendants have transacted business in this district. As illustrated above, Jebrock and Maxwell were shareholders of the Anglo Swiss company which owns 100% of AME, the New Jersey entity which offered the investment program. AME affiliated itself with TWM and TWM served as a conduit through which AME transacted and solicited business. In fact, 78% of all investment contracts were secured through the efforts of TWM. Specifically, via the mail and telephonic communications, as well as through wire transfers of funds, investment transactions were consummated in this district. *See Savage,* 611 F.2d at 277.

In addition, Jebrock, as an officer and director of TWM, was responsible for the

promotion of AME's investment program, at least in Florida, and solicited others to sell the program itself. Moreover, Jebrock had an employment agreement with AME, pursuant to which he received 20% of the net pretax profits of AME as compensation. The above clearly demonstrates that Jebrock and TWM transacted business with an entity in this forum.

Similarly, Maxwell transacted business with AME on a daily basis. *See, e.g.,* Deposition of Hilarie Frank and Affidavit of Carol Kahan. He reviewed AME's daily transactions and met with Bill Frank of AME at least on a weekly basis. Moreover, there is evidence in the record which illustrates that his company, ARC, liquidated almost all of the contracts purchased by investors of AME.

Thus, defendant Maxwell and ARC also transacted business in this district and therefore, as with defendants Jebrock and TWM, venue is properly laid in this district to conduct this litigation.

E. *Amendment of the Complaint*

 Defendants contend that plaintiffs have improperly amended the complaint and therefore it should be dismissed.

Federal Rule 15(a) provides that

a party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served ... otherwise a party may amend the party's pleadings only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

Since a responsive pleading in the form of an answer was filed on September 28, 1987, the plaintiffs may amend the complaint either by leave of court or by written consent of the adverse parties named in the complaint that is subject to the amendment. *See Davis v. Coler,* 601 F.Supp. 444, 447 (N.D.Ill.1984), *aff'd,* 789 F.2d 474 (7th Cir. 1986). Since Bill Frank, AME, FC & M and Anglo Swiss were the opposing parties at the time plaintiffs sought to amend their pleadings and since they have filed their consent to the amendments on December 17, 1987, securing their consent to amend the complaint with new causes of action for

violations of Section 4(b) of the CEA, 7 U.S.C. § 6(b), N.J.S.A. 49:3–56, 49:3–52, Fla.Stat. §§ 517.301(1), 517.312(1)(a) and (b), and 517.275, is sufficient to allow plaintiffs to file their amended complaint

 Although the above consent is effective with respect to amending the complaint with new causes of action, I find that a proposed second amended complaint that adds parties not named in the original complaint can be amended only with leave of court. *See* Fed.R.Civ.P. 21; *Age of Majority Educational Corp. v. Preller,* 512 F.2d 1241, 1245–46 (4th Cir.1975); *Holden v. R.J. Reynolds Industries,* 82 F.R.D. 157 (M.D.N.C.1979); *Madery v. Int'l Sound Technicians, et al.,* 79 F.R.D. 154, 156 (C.D.Calif.1978).

Federal Rule Civil Procedure 15(a) provides that the court should permit a party to amend his pleadings "freely ... when justice so requires." Thus, Rule 15(a) reflects a general presumption in favor of allowing a party to amend its pleadings. *See, e.g., Boileau v. O'Hare, et al.,* 730 F.2d 929 (3d Cir.1984). Furthermore, the United States Supreme Court has held that the district court should grant requests for leave to amend freely unless the underlying circumstances illustrate

apparent or declared reason such as undue delay, bad faith or dilatory motive on the part of a movant, repeated failure to the deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etcetera,

*Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) and thereby demonstrate that justice would not be served by granting a party leave to amend its pleadings. *Id.*

 In this case, I do not find that plaintiffs have behaved in a dilatory manner nor do I find that allowing the amendment will unduly prejudice the new defendants. Only six months have lapsed since the filing of the original complaint in this matter. Moreover, defendants' relationship with AME, an original defendant in

this action, and the existence of an awareness on the part of at least some of these new defendants of the ongoing investigation support a finding that these parties have not been unduly prejudiced nor surprised by the intervening six month period during which they were not named as defendants. Finally, I do not find that the proposed amendment is futile. Rather, the record at this time supports the assertion of a colorable claim against the new defendants.

For all of these reasons, I will grant plaintiffs leave to file the amended complaint.

### F. *Properly Pled Complaint*

Defendants also contend that the complaint is vague with respect to its allegations of fraud and therefore should be dismissed for failure to comply with Fed.R. Civ.P. 9(b).

Federal Rule of Civil Procedure 9(b) provides that "[i]n all averments of fraud ..., the circumstances constituting fraud ... shall be stated with particularity." The Court of Appeals for the Third Circuit has recognized that "in applying rule 9(b), focusing exclusively on its particularity language is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules." *Seville Industries Machinery v. Southmost Machinery*, 742 F.2d 786, 791 (3d Cir.1984), *cert. denied*, 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985) (quotation marks and citations omitted). Continuing, the court stated that

> Rule 9(b) requires plaintiffs to plead with particularity the "circumstances" of the alleged fraud in order to place the defendant on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior. It is certainly true that allegations of "date, place or time" fulfill these functions, but nothing in the rule requires them. Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations.

*Id.* In *Seville*, the plaintiffs satisfied Rule 9(b) by incorporating into the complaint a list identifying the pieces of machinery which were the subject of the alleged fraud. Moreover, in that case the complaint set forth the nature of the alleged misrepresentation. Although the complaint did not describe the precise words used, the court found that the complaint adequately described the nature and subject of the alleged misrepresentation. Thus, even absent allegations with respect to the exact factual context or words constituting the misrepresentation, a description of the nature and subject of the representation is sufficient. *See Kronfeld v. First Jersey Nat'l Bank*, 638 F.Supp. 1454, 1464 (D.N.J.1986).

With the above standards in mind, I have evaluated the within amended complaint and found that the plaintiffs have alleged the fraud-based offenses with sufficient particularity to comply with Rule 9(b). First, the complaint quotes, verbatim, the alleged representations. *See* Complaint ¶ 31 and all subparts. Thus, the complaint goes beyond describing the nature and the subject of the representations and presents the language used. Second, paragraphs 20–29 of the complaint explain the context in which the representations were made. Specifically, plaintiffs describe that defendants offered and sold an investment in precious metals through EBP contracts. The plaintiffs fully describe the payment plan as well as the purpose of the investment. Third, and relatedly, in paragraphs 12–19, the plaintiffs described the various defendants involved in the investment program as well as their roles in the scheme. Reading these paragraphs together, the defendants are effectively on notice as to their alleged role in the fraudulent scheme.

The complaint, therefore, reveals that "the plaintiffs have alleged the acts involved in the scheme and the people who they believe committed them. At least at this stage of the case, plaintiffs need not attribute each individual act to the individual defendant who committed it." *Petro-Tech Inc. v. Western Co. of North America*, 824 F.2d 1349 (3d Cir.1987).

Fourth, in addition to submitting their complaint, plaintiffs filed exhibits as well as legal memoranda in support of the counts of the complaint. These documents include affidavits of the various state investigators. These affidavits articulate the findings of the state investigations and include copies of the documents upon which a number of their conclusions are based. All of this information describes the transaction at issue and notifies the defendants of the alleged misconduct with which they are charged. Finally, with respect to defendants' allegation that plaintiffs failed to establish the existence of scienter, I note that Fed.R.Civ.P. 9(b) provides that "intent, knowledge, and other condition of mind of a person may be averred generally." This provision has been applied to allegations concerning a defendant's state of mind in a fraud claim. *Kronfeld, supra,* 638 F.Supp. at 1465. Thus, plaintiffs' conclusory allegation of defendants' scienter is sufficient under Rule 9(b). *Id.* at 1466.

Therefore, since the complaint and accompanying documents adequately describe the circumstances surrounding the alleged fraud, I find that the complaint has been pleaded in a manner consistent with this Circuit's interpretation of the level of pleading required under Rule 9. For all of these reasons, the complaint will not be dismissed.

### G. *Merits*

Having determined that I have subject matter jurisdiction over the within controversy, *in personam* jurisdiction over the properly served defendants and am presented with a properly amended and sufficiently pled complaint, I now turn to the issue as to whether plaintiffs have demonstrated a likelihood of success in showing defendants [47] have violated and will commit future violations of the CEA so as to warrant the issuance of preliminary equitable relief.

In order to obtain injunctive relief, plaintiffs need only establish a *prima facie* case that defendants engaged in illegal conduct in violation of the CEA. *Commodity*

*Futures Trading Commission v. Muller,* 570 F.2d 1296, 1300 (5th Cir.1978). Next, plaintiffs must show some reasonable likelihood of future violation of the Act. *Hunt, supra,* 591 F.2d at 1220. The likelihood of future violations may be inferred from past infractions based upon consideration of the totality of the circumstances to determine if the past infraction was an isolated occurrence as opposed to an indication of a systematic and continuous pattern of wrongdoing. *Id; CFTC v. British American Commodity Options Corp.,* 560 F.2d 135, 142 (2d Cir.), *cert. denied,* 438 U.S. 905, 98 S.Ct. 3123, 57 L.Ed.2d 1147 (1977); *CFTC v. Skorupskas,* 605 F.Supp. 923, 943 (S.D.N.Y.1985); *CFTC v. Crown Colony Commodity Options,* 434 F.Supp. 911, 925 (S.D.N.Y.1977).

Plaintiffs allege that defendants have violated Sections 4(a) and 4(b)(1) of the CEA. 7 U.S.C. § 6(a), 6(b)(1). Section 4(a) provides that

It shall be unlawful for any person to offer to enter into, enter into, to execute, to confirm the execution of, or to conduct any office or business anywhere in the United States, its territories, or possessions, for the purpose of soliciting or accepting any order for or otherwise dealing in any transaction in or in connection with a contract for the purchase or sale of a commodity for future delivery (other than a contract which is made on or subject to the rules of a board of trade exchange ...) *unless*

(1) such *transaction is conducted on or subject to the rules of a board of trade which has been designated by the commission as a "contract market" for such commodity;*

(2) such *contract is executed or consummated by or through a member of such contract market;* and

(3) such contract is evidenced by a record in writing which shows the date, the parties to such contract and their addresses, the property, and the terms of delivery: *provided,* that each contract market member shall keep such record for a period of three years from the date

---

**47.** I note that ARC has neither entered an appearance nor responded to the requested relief.

thereof, or for a longer period if the commission shall so direct, which record shall, at all times be open to the inspection of any representation of the Commission or the Department of Justice. (emphasis added).

 In order for these defendants to be subject to this statutory framework, it must first be determined whether defendants' investment constituted "a contract for the purchase or sale of a commodity for future delivery." 7 U.S.C. § 2.

It has been observed that "in determining whether a particular contract is a contract of sale of a commodity for future delivery over which the commission has regulatory jurisdiction by virtue of 7 U.S.C. § 2 ..., no bright-line definition or list of characterizing elements is determinative. The transaction must be viewed as a whole with a critical eye toward its underlying purpose." *CFTC v. Co Petro*, 680 F.2d 573, 580 (9th Cir.1982).

This contract of sale of a commodity for future delivery is commonly known as futures contract, *Breyer v. First National Monetary Corp.*, 548 F.Supp. 955, 963 (D.N.J.1982), and it is defined as "a contractual undertaking which can be transferred to third parties to buy or sell a fixed amount and grade of a certain commodity on some specified date." *Morgan, Harris, supra*, 484 F.Supp. at 675; *CFTC v. Co Petro*, 502 F.Supp. 806, 812, 813, 815 (S.D.N.Y.1980), *aff'd*, 680 F.2d 573, 579 (9th Cir.1982). As stated in *Breyer*,

> Among the distinguishing characteristics of a futures contract is its standardized form as to quantity and other terms. The standardization, set by the designated contract market, facilitates trading of the contracts. Although many of the traders never intend to take delivery of the underlying commodity,[48] the contracts provide for uniform delivery points and delivery dates.

*Breyer, supra* at 963 and n. 19. In general, if delivery of the commodity is not an expectation, the investment presumablly has the character of a futures contract. *Morgan Harris, supra* at 676–77; *Co Petro, supra* at 581.

Although the defendants contend that this program at issue required actual delivery of the metals upon liquidation, it is clear that

> self-serving labels that the defendants choose to give their contracts should not deter the conclusion that their contracts, as a matter of law, [are futures contracts subject to the CEA].

*Morgan, Harris, supra*, at 676; *CFTC v. U.S. Metals Depository Corp.*, 468 F.Supp. 1149, 1154 (S.D.N.Y.1979).

The record in this case reflects that delivery of physical metals rarely, if ever, occurred in the challenged program. The customer forwarded an initial fee, or down payment to AME, part of which was applied toward the total sales price. *See also Morgan, Harris, supra* at 675. When the client was ready to sell, he or she could have sold the metals subject to the contract and purchase new metals in essentially an offsetting transaction or the client could have taken delivery of the metals and pay the balance due. *See, e.g., Co Petro, supra* 502 F.Supp. at 812; *Co Petro, supra*, 680 F.2d at 579. The profit received or the loss sustained in such a transaction depend upon the difference in the price of the commodity when the contract was entered and the metals are sold. *Id. See Morgan, Harris, supra* at 675, where the court recognized that profit occurs if the sale price of the "right to future delivery exceeds the purchase price." Profits and losses occurred upon liquidation without the actual exchange of metals. *See* discussion *supra.* Thus, I find that the program at issue is in fact a futures contract subject to the strictures of the CEA.

---

**48.** It has been noted that "[a]s a matter of reality and practice, rarely does a future commodity dealer actually intend to take or make delivery of that commodity." *Cargill Inc. v. Hardin*, 452 F.2d 1154, 1156 n. 2 (8th Cir.1971), *cert. denied*, 406 U.S. 932, 92 S.Ct. 1770, 32 L.Ed.2d 135 (1972). These contracts are "undertaken as a means of assuming or shifting risk of change in the price of a commodity rather than as a means of transferring ownership of the actual commodity." *CFTC v. Co Petro Marketing*, 502 F.Supp. 806, 812 (C.D.C.A.1980), *aff'd*, 680 F.2d 573 (9th Cir.1982).

The plain language of the statute illustrates that central to the Act's regulation of trading in commodity futures, is the requirement that persons involved in trading be registered. *British American, supra,* 670 F.2d at 138; *Precious Metals Associates, Inc. v. Commodity Futures Trading Comm'n,* 620 F.2d 900, 905 (1st Cir.1980); *Savage, supra,* 611 F.2d at 280. This particular provision essentially makes it unlawful for a seller to make a contract of sale of commodities for future delivery if the seller is not on or subject to a board of trade. 7 U.S.C. § 6; *Co Petro, supra,* 680 F.2d at 581. A "board of trade" is defined as any exchange or association of persons engaged in the business of buying or selling any commodity. 7 U.S.C. § 2. A board of trade cannot lawfully sell or buy commodities unless designated by the CFTC as a contract market. *Co Petro, supra,* 680 F.2d at 582. A board of trade must apply to the CFTC for such designation. *Id.* Thus, trading may only take place on a "licensed exchanged designated as a 'contract market' and prices must be established by competitive trading on the exchange." *Breyer, supra,* at 963.

■ In this case, AME and TWM are associations of persons engaged in the selling of commodities for future delivery. Therefore, they are boards of trade. The record reveals that neither the individual nor corporate defendants have applied to the CFTC for designation as "contract markets." *See* Declaration of Jean Webb, dated December 18, 1987, ¶ 3, attached as Ex. O to CFTC's Brief. In fact, the brochure through which defendants solicited investors explicitly states that the corporate entities are "self-regulated." Thus, in light of this admission and the fact the contracts entered into provided for an agreement of sale of a commodity for future delivery, I find that plaintiffs are likely to succeed in proving that defendants AME's and TWM's failure to seek designations as a contract market or operate subject to rules application to such market violated 7 U.S.C. § 6(a), and continued sales, absent such designation would result in future violations of this provision of the act and is contrary to the public interest.

Thus, defendants' failure to comply with this provision of the act is a sufficient basis upon which to issue injunctive relief. Failure to enjoin the noncomplying parties renders the requirement a nullity, undermines Congress' explicit intent, and encourages unregistered sales to continue. *British American, supra,* 560 F.2d at 142. For this reason, injunctive relief should issue.

Plaintiffs also assert that they can establish a likelihood of success in proving that all of the defendants have violated and will continue to violate Section 6b(A) of the CEA and therefore, injunctive relief should issue. Section 6b(A) provides that

It shall be unlawful ... (2) for any person, in or in connection with any order to make ... any contract of sale of any commodity for future delivery ... [which] may be used for (a) hedging any transaction in interstate commerce in such commodity, or ... (c) delivery of any such commodity sold shipped or received in interstate commerce ...

(A) to cheat or defraud or attempt to cheat or defraud such other person.

Hence, this section declares it unlawful for any person to deceive or defraud any other person in connection with the making of a contract for the sale of any commodity for future delivery. *Saxe v. E.F. Hutton & Co.,* 789 F.2d 105, 109 (2d Cir.1986).

In order to hold the defendants liable under this section, plaintiffs must establish that defendants willfully engaged in fraudulent conduct. *Hill v. Bache Halsey Stuart Shields, Inc.,* 790 F.2d 817, 822 (10th Cir.1986); *CFTC v. Morse,* 762 F.2d 60, 65 (8th Cir.1985); *Horn v. Ray & Friedman Co.,* 776 F.2d 777, 780 (8th Cir.1985); *McIlroy v. Dittmer,* 732 F.2d 98, 102 (8th Cir.1984); *Greenwood v. Dittmer,* 776 F.2d 785, 789 (8th Cir.1985); *First Commodity Corp. v. CFTC,* 676 F.2d 1, 4–5 (1st Cir. 1982); *Savage, supra* 611 F.2d at 283; *Silverman v. CFTC,* 549 F.2d 28 (7th Cir. 1977); *Kotz v. Bache Halsey Stuart Inc.,* 685 F.2d 1204, 1207 (9th Cir.1982); *CFTC v. Premex Inc.,* 655 F.2d 779, 783 (7th Cir. 1981); *Haltmier v. CFTC,* 554 F.2d 556, 562 (2d Cir.1977); *McCurnin v. Kohlmeyer*

& Co., 347 F.Supp. 573, 575 (E.D.La.1972), aff'd, 477 F.2d 113 (5th Cir.1973); *CFTC v. U.S. Metals Depository Co.*, 468 F.Supp. 1149, 1161 (S.D.N.Y.1979); *Evanston Bank v. Conticommodity Services, Inc.*, 623 F.Supp. 1014, 1022 (D.C.Ill.1985); *Woods v. Reno Commodities Inc.*, 600 F.Supp. 574, 578 (D.Nev.1984); *Merrill Lynch Futures Inc. v. Kelly*, 585 F.Supp. 1245, 1252 (S.D.N.Y.1984).

Thus, plaintiffs must prove the elements of common law fraud. *Horn, supra* 776 F.2d at 780. In order to prove a *prima facie* case of legal fraud, plaintiffs must set forth (1) a material misrepresentation of presently existing or past fact, (2) knowledge of the falsity by the person making the misrepresentation, (3) intent that the misrepresentation be relied upon, and (4) reliance on the misrepresentation. *B.F. Hirsch v. Enright Refining Co., Inc.*, 751 F.2d 628, 631 (3d Cir.1984).

■ Hence, in making out a claim, plaintiffs must establish that defendants acted deliberately and with knowledge of the fraudulent nature of the false statements of omissions, *see Evanston, supra*, 623 F.Supp. at 1022, but plaintiffs need not show that defendants acted with an evil motive or an intent to injure. *McIlroy, supra*, 732 F.2d at 101; *Haltmier, supra*, 554 F.2d at 552; *Herman v. T & S Commodities*, 578 F.Supp. 601, 604 (S.D.N.Y.1983).

Courts have found that fraudulent conduct may occur during solicitations of accounts and potential customers through material misrepresentations with respect to the kinds of trading for which investment funds are used, the persons with whom the entity deals, the handling of the account, and projections regarding profitability and risk. *Saxe, supra* 789 F.2d at 110–12. Statements on these matters are material because there is a substantial likelihood that a reasonable investor would consider the assertions important in making their investment decision. Thus, when even an unregulated or unregistered entity engages in fraudulent conduct with respect to solicitations of accounts, the conduct is subject to the prohibitions embodied in section 6b(A). *Id.* at 111.

Similarly, an entity will be charged with engaging in fraudulent conduct, when, for example, that party deliberately and knowingly engaged in acts that are contrary to the investor's instructions. *Haltmier, supra*, 554 F.2d at 552. For instance, the arbitrary, unreasonable or wrongful liquidation of a customer's account serves as a basis for an action brought under section 6(b). *Woods, supra* 600 F.Supp. at 578. Similarly, a violation of section 6(b) occurs if defendant engaged in an unauthorized trade. *Herman, supra* 578 F.Supp. at 603.

■ In this case, plaintiffs allege that defendants' fraudulent misrepresentations are apparent from the face of the investment brochure and that on this basis plaintiffs have a reasonable likelihood to succeed on their claim that defendants have violated § 6b(A). *See* supra notes 25–32 and accompanying text. The statements listed on the brochure embody representations that would be important to a reasonable investor. For instance, the statements describe defendants' expertise, their ability to fulfill the contracts, the relative risk-free nature of the investment and its profitability.[49] In addition, there are assertions that funds remitted upon entry of the contract are placed in government backed securities. Finally, there are statements which allegedly explain the fees due upon liquidation.

The record reflects that defendants falsely represented the security, profitability, costs and risk-free nature of the investment. In addition, the record reveals that these statements were intentionally made. The evidence shows that defendant Maxwell carefully prepared and reviewed the promotional brochure. *See* Deposition of Hilarie Frank at 84, 93. Similarly, AME's selling agents, such as TWM and Jebrock, distributed the brochures and exposed representation contained therein. Thus, the material representations were made knowingly and were distributed with the intent that the statements would be relied upon by the investing public. The purchaser

---

49. *See* notes 24–26, 28 and 42 and accompanying text.

inevitably relied on these representations to their detriment. Therefore, given the false nature of these statements, plaintiffs have established a likelihood of proving that defendants violated section 6b(A).

Other fraudulent mispresentations were made. For instance, AME represented that it would place its customers in touch with "independent" third party agents, who would handle the alleged delivery of the metals. Not only is there no support in the record for the assertion that metals were delivered, *see supra* notes 29, 31–33 and accompanying text, but the record also demonstrates the strong relationship between the principals of AME and ARC, and that ARC was virtually the only agent who facilitated liquidations for the customers of AME. *See supra* note 18–21, 37, 40 and accompanying text.

The evidence also reveals that defendants used investors funds in unauthorized ways and thereby engaged in fraudulent conduct. Apparently, upon forwarding the initial payment, the investor believed, based on the representations of the defendants, that his down payment would be placed "in government backed securities and large 'omnibus' hedging accounts which are maintained on the leading commodity futures exchanges." *See* AME Brochure. The evidence reveals, however, that this representation was misleading. The record suggests that funds received from clients were used not only for investments in future contracts, but also as loans and mortgages for the benefit of Robert Maxwell and his family. *See* supra at note 26. In addition, the evidence fails to support the assertion that these funds were invested in government backed securities, such as certificates of deposit or treasury rates. *See* supra at notes 26 and 28. Moreover, it does not appear that these funds were used for the purchase of metals. *See* supra at note 26.

In addition, the record reveals that the defendants knowingly engaged in acts that were contrary to the investors directions. The evidence reveals that in May of 1987 ARC liquidated customer contracts on the basis of prices selected from a three day spread rather than based on the market rates that existed on the date that the client placed the liquidation order. *See* note 45 and accompanying text. In addition, it appears that at a different point in time, ARC filled liquidation orders based on the market price of the metals recorded the day following the date on which the client's liquidation order was placed.

Thus, for these further reasons, I find that plaintiffs have shown a strong likelihood of proving that the defendants have each engaged in conduct which violated section 6b(A).

■ I now must determine if there is a likelihood of future violations absent the issuance of an injunction.

The record supports a finding that the sales/trading scheme conducted illustrates that the violations were not isolated, but rather were part of a systematic plan to entice investors to join the EBP. In light of such systematic conduct, the court may infer that future violations will occur. This inference is particularly appropriate in this case because five states have issued cease and desist orders with respect to the EBP and yet defendants continued to solicit investors in other jurisdictions. *See* note. 23.

Therefore, I find that plaintiffs have carried their burden imposed under 7 U.S.C. § 13a–1 and I will issue the requested injunctive relief and enjoin all defendants from engaging in the commodity futures business.

### H. *Ancillary Relief*

■ In addition to injunctive relief, plaintiffs request that this court also grant ancillary equitable relief. Given the remedial nature of the CEA, the district court has broad discretion to fashion appropriate relief. *CFTC v. Muller*, 570 F.2d 1296, 1300 (5th Cir.1978). Pursuant to the act, the court may issue ancillary equitable relief in the nature of an appointment of a receiver, an accounting, disgorgement, restitution and a freeze of all assets. *Co Petro, supra*, 680 F.2d at 583–84; *Skorupskas, supra*, 605 F.Supp. at 943. I will first address the propriety of issuing such

relief with respect to the corporate defendants.

The appointment of a receiver may assure that the defendants will not re-enter the futures business in violation of the injunction. *Co Petro, supra, id.* In addition, the receiver can prevent the diversion of corporate assets which of course would be detrimental to the creditors. This will preserve the estate as to eventually make restitution to the injured investors. *Morgan, Harris, supra* 484 F. Supp. at 677–79. Moreover, a receiver can investigate corporate activities and ascertain the corporation's financial status. *Id.*

For all of these reasons, I will, as I have already done with respect to defendants Anglo Swiss, AME and FC & M, appoint Thomas Greelish, Esq., as the temporary equitable receiver of the corporate defendants ARC and TWM. He will be empowered to gather the assets, investigate the defendants transactions and determine their financial liabilities. His investigations will assist the court in determining whether and in what amounts restitution must be made.

The act also permits the court to order an accounting of all of the corporate defendants' assets and liabilities. Therefore, I order the receiver to conduct such an accounting to become familiar with the assets of the defendant corporations as well as their financial liabilities. To facilitate such an accounting, the act also contemplates the imposition of a freeze over the corporate defendants' assets. *Morgan, Harris.* Such a freeze maintains the status quo and enhances the possibility of awarding complete relief to the injured parties at the close of this litigation. *Muller, supra,* 570 F.2d at 1296, 1301. A freeze also maintains the court's jurisdiction over the assets should a disgorgement be ordered. *Id.* at 1301, *Morgan, Harris,* 484 F.Supp. at 677–79. A disgorgement prevents a violator from retaining his ill gotten gains which would frustrate the purpose of the CEA. *Porter v. Warner Holding,* 328 U.S. 395, 400, 66 S.Ct. 1086, 1090, 90 L.Ed. 1332 (1946); *Hunt, supra* 591 F.2d 1220; *Co Petro, supra* 680 F.2d at

584. Therefore, as a freeze is appropriate in this case, I further order that all assets of the corporate defendants be frozen.

In addition, I will freeze the assets of defendants Jebrock and Maxwell. I do so after careful consideration of the evidence against them. As discussed exhaustively in my findings of fact, Mr. Jebrock had a significant role at AME and was president of TWM. Relatedly, Mr. Maxwell controlled both ARC and AME. The record reveals that these corporate entities were used as conduits for the promotion of this unlawful program and the funds received by each were intermingled and used for the benefit of the individual defendants in the forms of loans, mortgages, hefty salaries and commissions. As it is difficult to demarcate in what ways the defendants coalessed the assets, I find that a freeze over the assets of defendants Jebrock and Maxwell to be the appropriate modality to preserve the *res* of the litigation and to recover any ill gotten gains allegedly acquired by the individuals through the corporate entities in violation of the CEA.

Since I have found that plaintiffs have demonstrated likely success on the merits with respect to their claims as to past and future violations of the CEA, and since this is a sufficient basis upon which to issue injunctive and ancillary equitable relief, I need not discuss the likelihood of plaintiffs' success in proving alleged violations of the securities laws of New Jersey and Florida.

Thus, on the basis of plaintiffs' demonstration as to defendants' probable violation of the Commodity Exchange Act, I will grant the requested injunctive and ancillary equitable relief.

## CONCLUSION

In conclusion, I find that I have subject matter jurisdiction over the within controversy, *in personam* jurisdiction over the properly served defendants, and am presented with a properly amended and sufficiently pled complaint. In addition, I find that plaintiffs have demonstrated a likelihood of success in showing that defendants have violated and will continue to violate the Commodities Exchange Act and

therefore, I will grant their request for preliminary injunctive relief and ancillary equitable relief in the form of appointment of a receiver, an accounting freeze of the assets of the individual and the corporate defendants and order the individual defendants within ten days to make an accounting of all transactions engaged in since December 23, 1987.

The order to be entered shall track the one which was submitted by the plaintiffs, with the following exceptions (1) as to violations of the statutes of New Jersey and Florida and (2) as to their proposed allotment to *any* monies for living expenses and attorneys' fees.